IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

|  |  |  |
|---|---|---|
| MULTILAYER STRETCH CLING FILM HOLDINGS, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 12-cv-2108-JPM-cgc |
| BERRY PLASTICS CORPORATION, | ) ) | |
| Defendant. | ) ) ) | |

**ORDER ON CLAIM CONSTRUCTION FOR "WHEREIN EACH OF SAID TWO OUTER LAYERS AND EACH OF SAID FIVE INNER LAYERS HAVE DIFFERENT COMPOSITIONAL PROPERTIES WHEN COMPARED TO A NEIGHBORING LAYER"**

This action arises from allegations by Plaintiff Multilayer Stretch Cling Film Holdings, Inc. ("Multilayer") against Defendant Berry Plastics Corporation ("Berry") for patent infringement of U.S. Patent No. 6,265,055, entitled Multilayer Stretch Cling Film ("the '055 Patent"). This case comes before the Court on remand from the United States Federal Circuit Court of Appeals. Multilayer Stretch Cling Film Holdings, Inc. v. Berry Plastics Corp., No. 2015-1420, 2016 WL 4137673 (Fed. Cir. Aug. 4, 2016).

**I. BACKGROUND**

Before the Court is the parties' request for claim construction pursuant to Markman v. Westview Instruments, Inc.,

52 F.3d 967 (Fed. Cir. 1995) (en banc). On October 17, 2012, the Court consolidated four patent-infringement actions for the purpose of claim construction and set a consolidated claim construction schedule.[1] (Multilayer Stretch Cling Film Holdings, Inc. v. MSC Marketing & Technology, Inc. d/b/a Sigma Stretch Film, No. 2:12-cv-2112-JPM-tmp, ECF No. 49 at PageID 378; see also id., ECF No. 95 at PageID 3353 n.1.)[2] On November 20, 2013, the Court entered its Order Following Claim Construction Hearing. (ECF No. 95 at PageID 3350.) In that Order, the Court did not construe the disputed term "wherein each of said two outer layers and each of said five inner layers have different compositional properties when compared to a neighboring layer," a term found in Claim 1 and Claim 28 of the '055 Patent. (See '055 Patent, Second Ex Parte Reexamination Certificate (Apr. 7, 2009), ECF No. 1-4 at PageID 25; Certificate of Correction (Apr. 7, 2009), ECF No. 1-4 at PageID 22.) In a separate Order filed on November 8, 2013, the Court entered its Proposed Construction for "wherein each of

[1] The consolidated cases are as follows: Multilayer Stretch Cling Film Holdings, Inc. v. Inteplast Group Ltd., No. 2:12-cv-2107-WGY-dkv; Multilayer Stretch Cling Film Holdings, Inc. v. Berry Plastics Corp., No. 2:12-cv-2108-WGY-cgc; Multilayer Stretch Cling Film Holdings, Inc. v. Intertape Polymer Group, Inc., No. 2:12-cv-2109-JPM-cgc; and Multilayer Stretch Cling Film Holdings, Inc. v. MSC Marketing & Technology, Inc. d/b/a Sigma Stretch Film, No. 2:12-cv-2112-JPM-tmp.
[2] The majority of documentation related to claim construction was filed in Multilayer Stretch Cling Film Holdings, Inc. v. MSC Marketing & Technology, Inc. d/b/a Sigma Stretch Film, No. 2:12-cv-2112-JPM-tmp; therefore, unless otherwise noted, all ECF citations refer to that case. Any citation specifically related to filings in the instant case, Multilayer Stretch Cling Film Holdings, Inc. v. Berry Plastics Corp., No. 2:12-cv-2108-JPM-cgc, will be designated as (No. 12-2108, ECF No. ___.)

said two outer layers and each of said five inner layers have different compositional properties when compared to a neighboring layer" and "Compositional Properties." (ECF No. 96.)  The parties were required to submit supplemental briefing on the Court's proposed construction within fourteen (14) days. (Id. at PageID 3476.)   The parties did not file such briefs in this case; rather, they submitted briefs in the parallel action in response to the same order. (See ECF Nos. 98-99.)

On October 19, 2016, after the Federal Circuit's remand, the Court held a telephonic scheduling conference.  (No. 12-2108, ECF No. 176.)  During the conference, the parties requested that the Court construe "wherein each of said two outer layers and each of said five inner layers have different compositional properties when compared to a neighboring layer" and "compositional properties", which the Court did not finalize prior to the appeal to the Federal Circuit.  On October 21, 2016, the Court ordered the parties to file responsive briefs to its November 2013 proposed construction. (ECF No. 179.)  The parties filed timely briefs on October 28, 2016.  (ECF Nos. 181-82.)

For the reasons stated herein, the Court construes the claim terms as follows:[3]

| CLAIM TERM | COURT'S CONSTRUCTION |
|---|---|
| Wherein each of said two outer layers and each of said five inner layers have different compositional properties when compared to a neighboring layer | "wherein each of said two outer layers and each of said five inner layers has a different composition and end-use properties than each immediately adjacent layer" |
| Compositional property | "an end-use property after processing the combined resin(s) and/or resin(s) and resin additive(s)" |

## II. CLAIM CONSTRUCTION STANDARD

"In conducting an infringement analysis, a court must first determine the meaning of any disputed claim terms and then compare the accused device to the claims as construed." Proveris Sci. Corp. v. Innovasystems, Inc., 739 F.3d 1367, 1371-72 (Fed. Cir. 2014) (citing Wavetronix LLC v. EIS Elec. Integrated Sys., 573 F.3d 1343, 1354 (Fed. Cir. 2009)); accord Markman v. Westview Instruments, Inc., 52 F.3d 967 (Fed. Cir. 1995) (en banc). Regarding the first step, claim construction is a question of law with "evidentiary underpinnings" to be determined by the court. Teva Pharm. USA, Inc. v. Sandoz,

---

[3] A comparison between the Court's construction and the parties' proposed constructions can be found in Appendix A.

Inc., 135 S. Ct. 831, 835, 838 (2015); Markman v. Westview Instruments, Inc., 517 U.S. 370, 390 (1996)). Where terms or phrases are "not commonly understood," a court may make subsidiary findings of fact based on evidence extrinsic to the patent to assist the court in its task of claim interpretation. See Teva Pharm., 135 S. Ct. at 837–38. These factual determinations precede the court's ultimate legal construction of the patent's claims. Id.

**A. Claims**

Patent claims generally fall into two broad categories: product claims and method claims. A product claim describes the invention of a physical product, such as a machine or pharmaceutical tablet. A method claim describes a series of steps, or processes, constituting the claimed invention. In construing patent claims, courts "must generally take care to avoid reading [method] limitations into [product] claims . . . because the process by which a product is made is irrelevant to the question of whether that product infringes a pure [product] claim." Baldwin Graphic Sys., Inc. v. Siebert, Inc., 512 F.3d 1338, 1344 (Fed. Cir. 2008). That being said, some patent claims describe a product by the process used to achieve it. See Abbott Labs. v. Sandoz, Inc., 566 F.3d 1282, 1291 (Fed. Cir. 2009). Additionally, an applicant may disclaim products created using certain processes if the applicant "overcomes a

rejection against [both] product and process claims by indicating that the process is necessary to produce the claimed product" and, in doing so, fails to "limit the disclaimers to [only] the process claims." AstraZeneca LP v. Breath Ltd., 542 F. App'x 971, 977 (Fed. Cir. 2013), as amended on reh'g in part (Dec. 12, 2013). Such "product-by-process" claims should be read to require use of the claimed process. Baldwin, at 1294.

Claim construction begins with the language of the claims themselves. Braintree Labs., Inc. v. Novel Labs., Inc., 749 F.3d 1349, 1354-55 (Fed. Cir. 2014) (citing Interactive Gift Express, Inc. v. Compuserve Inc., 256 F.3d 1323, 1331 (Fed. Cir. 2001)). Claim terms in the patent "are generally given their ordinary and customary meaning, which is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." Ethicon Endo-Surgery, Inc. v. Covidien, Inc., 796 F.3d 1312, 1323 (Fed. Cir. 2015) (citing Phillips v. AWH Corp., 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc)). This general rule has two known exceptions: (1) "when a patentee sets out a definition and acts as his own lexicographer," or (2) "when the patentee disavows the full scope of the claim term either in the specification or during prosecution." Hill-Rom Servs., Inc. v. Stryker Corp., 755 F.3d 1367, 1371 (Fed. Cir. 2014) (quoting Thorner v. Sony Comput. Entm't Am. LLC, 669 F.3d 1362, 1365 (Fed. Cir. 2012)).

Where a claim term has more than one "ordinary" meaning, or
when reliance on a term's "ordinary" meaning does not resolve
the parties' dispute, a determination that a claim term "needs
no construction" or has the "plain and ordinary meaning" may be
inadequate. O2 Micro Int'l Ltd. v. Beyond Innovation Tech.
Co., 521 F.3d 1351, 1361 (Fed. Cir. 2008).

"To determine the scope and meaning of a claim, we
examine the claim language, written description, prosecution
history, and any relevant extrinsic evidence." InTouch Techs.,
Inc. v. VGO Commc'ns, Inc., 751 F.3d 1327, 1339 (Fed. Cir.
2014) (citing Phillips, 415 F.3d at 1315-19); Markman, 52 F.3d
at 978-79.

> Apart from the claim language itself, the
> specification is the single best guide to the meaning
> of a claim term.  And while the prosecution history
> often lacks the clarity of the specification, it is
> another established source of intrinsic evidence.
> After considering these three sources of intrinsic
> evidence, a court may also seek guidance from
> extrinsic evidence.  However, extrinsic evidence may
> be less reliable than the intrinsic evidence.

Vederi, LLC v. Google, Inc., 744 F.3d 1376, 1382 (Fed. Cir.
2014) (citations and internal quotation marks omitted).

## B. Intrinsic Record

### 1. Specification

"The specification is fundamental to claim construction,
as it is the single best guide to the meaning of a disputed
term." Trading Techs. Int'l, Inc. v. Open E Cry, LLC, 728 F.3d

1309, 1319 (Fed. Cir. 2013) (quoting Phillips, 415 F.3d at 1315).  In determining the meaning to be given to claim terms, a court must read the terms in the context of the specification as it is the patent specification which, by statute, must contain a "full, clear, concise, and exact" description of the invention.  35 U.S.C. § 112(a); accord Phillips, 415 F.3d at 1311.  Consequently, "claim terms must be construed in light of the specification and prosecution history, and cannot be considered in isolation."  GE Lighting Sols., 750 F.3d at 1308-09 (citing Phillips, 415 F.3d at 1313).

Although claim terms are normally given their ordinary and customary meaning, a patentee may depart from this rule by acting as his own lexicographer or by disavowing the claim scope in the specification.  Phillips, 415 F.3d at 1316. "Idiosyncratic language, highly technical terms, or terms coined by the inventor are best understood by reference to the specification."  3M Innovative Props. Co. v. Tredegar Corp., 725 F.3d 1315, 1321 (Fed. Cir. 2013) (citing Phillips, 415 F.3d at 1315-16).  To use a special definition of a claim term, the patentee must "clearly" redefine the term and have an "express intent" to do so within the patent.  Thorner, 669 F.3d at 1365- 66; Elekta Instrument S.A. v. O.U.R. Sci. Int'l, Inc., 214 F.3d 1302, 1307 (Fed. Cir. 2000).

Courts must "not read limitations from the embodiments in the specification into the claims." Hill-Rom, 755 F.3d at 1371 (citing Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 904 (Fed. Cir. 2004)). This requirement prevents a court from limiting the scope of the claims to only the preferred embodiment or specific examples disclosed in the specification. Epos Techs. Ltd. v. Pegasus Techs. Ltd., 766 F.3d 1338, 1341 (Fed. Cir. 2014) ("[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." (quoting Liebel-Flarsheim, 358 F.3d at 913)). "By the same token, the claims cannot 'enlarge what is patented beyond what the inventor has described in the invention.'" Abbott Labs. v. Sandoz, Inc., 566 F.3d 1282, 1288 (Fed. Cir. 2009) (quoting Biogen, Inc. v. Berlex Labs., Inc., 318 F.3d 1132, 1140 (Fed. Cir. 2003)).

## 2. Prosecution History

"A court should also consider the patent's prosecution history, if it is in evidence. The prosecution history consists of the complete record of the proceedings before the [U.S. Patent and Trademark Office]." InTouch Techs., 751 F.3d at 1341 (citations and internal quotation marks omitted). "[P]rosecution history can often inform the meaning of the

claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." Plantronics, Inc. v. Aliph, Inc., 724 F.3d 1343, 1350 (Fed. Cir. 2013) (alteration in original) (quoting Phillips, 415 F.3d at 1317). A court "does not rely on the prosecution history to construe the meaning of the claim to be narrower than it would otherwise be unless a patentee limited or surrendered claim scope through a clear and unmistakable disavowal." 3M, 725 F.3d at 1322 (citing Trading Techs. Int'l, Inc. v. eSpeed, Inc., 595 F.3d 1340, 1352 (Fed. Cir. 2010)).

**C. Extrinsic Evidence**

"Although it is less significant than intrinsic evidence, a court can consider extrinsic evidence in the record, which 'consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises.'" Aristocrat Techs. Austl. PTY Ltd. v. Int'l Game Tech., 709 F.3d 1348, 1355 (Fed. Cir. 2013) (quoting Phillips, 415 F.3d at 1317). Although such evidence is generally considered less reliable than the intrinsic record, a court is free to consider it and may do so at any stage of its inquiry. Phillips, 415 F.3d at 1317-19. A court may rely on extrinsic evidence so long as the evidence

does not contradict the intrinsic record.  *Advanced Fiber*

*Techs. (AFT) Trust v. J & L Fiber Servs., Inc.*, 674 F.3d 1365,

1374–75 (Fed. Cir. 2012) (citing *Phillips*, 415 F.3d at 1319).

## III. ANALYSIS

### A.  The Disputed Claims

The parties disagree on the proper construction of

language found in nine claims in the '055 Patent.  The claims

containing disputed language are as follows, with the contested

language underlined.

### 1.  Claims 1 and 28

Claim 1 and Claim 28 are the two independent claims of the '055
Patent, on which the remaining claims depend.

> 1.  A multi-layer, thermoplastic stretch wrap film
> containing seven separately identifiable polymeric
> layers, comprising:
>
> (a)  two identifiable outer layers, at least one of
> which having a cling performance of at least 100
> grams/inch, said outer layer being selected from the
> group consisting of linear low density polyethylene,
> very low density polyethylene, and ultra low density
> polyethylene resins, said resins being homopolymers,
> copolymers, or terpolymers, or ethylene and alpha-
> olefins; and
>
> (b)  five identifiable inner layers, with each layer
> being selected from the group consisting of linear
> low density polyethylene, very low density
> polyethylene, ultra low density polyethylene, and
> metallocene-catalyzed linear low density polyethylene
> resins; said resins are homopolymers, copolymers, or
> terpolymers, or ethylene and $C_3$ to $C_{20}$ alpha-olefins;

11

> wherein each of said two outer layers and each of
> said five inner layers have different compositional
> properties when compared to a neighboring layer.

(Claim 1, '055 Patent, ECF No. 1-4 at PageID 26 (emphasis
added).)

> 28.   A multi-layer, thermoplastic stretch wrap film
> containing seven polymeric layers, comprising:
>
> (a)   two outer layers, at least one of which
> having a cling performance of at least 100
> grams/inch, said outer layer being selected from
> the group consisting of linear low density
> polyethylene, very low density polyethylene, and
> ultra low density polyethylene resins, said
> resins being homopolymers, copolymers, or
> terpolymers, of ethylene and alpha-olefins; and
>
> (b)   five inner layers, with each layer being
> selected from the group consisting of linear low
> density polyethylene, very low density
> polyethylene, ultra low density polyethylene,
> and metallocene-catalyzed linear low density
> polyethylene resins; said resins being
> homopolymers, copolymers, or terpolymers, of
> ethylene and $C_3$ to $C_{20}$ alpha-olefins,
>
> wherein at least one of said inner layers
> comprises a metallocene catalyzed linear low
> density polyethylene resin with a melt index of
> 0.5 to 3 dg/min and a melt index ratio of 16 to
> 80; and
>
> wherein each of said two outer layers and each
> of said five inner layers have different
> compositional properties when compared to a
> neighboring layer.

(Claim 28, '055 Patent, ECF No. 1-4 at PageID 26 (emphasis
added).)

**2. Claim 32**

> 32.   The film in claim 1, wherein the compositional
> property is the presence of a resin additive.

(Claim 32, '055 Patent, ECF No. 1-4 at PageID 26 (emphasis added).)  The same underlined term is found in dependent claims 29-31 and 33-35.  (Id.)

**B. The Disputed Terms**

**"wherein each of said two outer layers and each of said five inner layers have different compositional properties when compared to a neighboring layer" and "compositional properties"**

The Court's November 2013 proposed construction construed "wherein each of said two outer layers and each of said five inner layers have different compositional properties when compared to a neighboring layer" as "wherein each of said two outer layers and each of said five inner layers is a different composition than each immediately adjacent layer, which, in turn, yields a different end-use property."  (No. 12-212, ECF No. 96 at PageID 3476.)  The Court also construed "compositional properties" as "an end-use property which is a result of the combined ingredients."  (Id.)

Multilayer asserts that the Court's construction improperly narrows the claims by describing the end-use property of the layers by their composition prior to processing.  (See No. 12-2108, ECF No. 182 at PageIDs 4174-77.)  Multilayer concedes "that [while] the inherent properties of the ingredients selected for the films impact the compositional

properties of the finished film," so does the subsequent
processing.  (Id. at PageID 4176.)  Multilayer argues that
whether "the inherent properties of the ingredients or the
processing conditions affect the compositional properties of
each layer in the finished film is not relevant to the claims,
because the claims only relate to the finished film."  (Id.)
Multilayer, therefore, proposes the following construction:
"wherein each of said two outer layers and each of said five
inner layers have different end-use properties than each
immediately adjacent layer."  (Id. at PageID 4178.) Multilayer
further proposes that "compositional properties" mean "an end-
use property."  (Id.)  Multilayer argues that these
constructions, divorced from the ingredients chosen or
processes used, adequately describe the finished film's
attributes.  (See id.)

   Berry initially argues that the claim term "compositional
properties" is indefinite because it is not found in the '055
Patent specification.  (ECF No. 181 at PageID 4164-65.)  Berry
asserts that the '055 Patent "fails to inform how one of
ordinary skill in the art is to determine such [compositional]
properties of individual film layers separate from the film as
a whole."  (Id. at PageID 4166.)  Berry further argues that
Multilayer's construction would allow it to "accuse films of

infringement even if the adjacent layers are of the same resins but the layers arguable [sic] undergo any difference during processing conditions such that the patentee can argue the undefined 'compositional properties' have been altered one relative to the other." (Id. at PageID 4167.) Although the Court takes note of Berry's indefiniteness argument, pursuant to its November 1, 2016 Order, the Court's "determination [on such matters] will be made in accordance with the required filings set out in the Scheduling Order, filed on October 21, 2016." (ECF No. 185 at PageID 4189.)

Berry next argues that if the Court were to construe the terms, it agrees with the Court's proposed construction for "wherein each of said two outer layers and each of said five inner layers have different compositional properties when compared to a neighboring layer" as "wherein each of said two outer layers and each of said five inner layers is a different composition than each immediately adjacent layer, which, in turn, yields a different end-use property." (ECF No. 181 at PageID 4170-71.) Berry proposes a different construction for "compositional properties," however, as "an end-use property which yields a desired, physically distinguishable and material effect as a result of the combined ingredients." (Id. at PageID 4171.) Berry contends that its "desired, physically

15

distinguishable" language is consistent with intrinsic evidence cited by the Court.  (<u>Id.</u>)

After reviewing the language of the claims and intrinsic evidence, as stated in the Order Following Claim Construction Hearing (Pt. IV.B., ECF No. 95), the Court first finds the patent specification and prosecution history teach that, prior to processing, the resin(s) and/or resin(s) and resin additive(s) of each layer are chosen for their "specific film end-use properties," and that each layer's composition and end-use properties should differ from immediately adjacent layers. The language of the patent, the prosecution history, and extrinsic evidence support this conclusion.  Secondly, the Court finds that the parties' constructions are not supported by intrinsic evidence.

**1. The Court's Construction**

The patent specification and prosecution history teach that, prior to processing, the resin(s) and/or resin(s) and resin additive(s) of each layer are chosen for their "specific film end-use properties," and that each layer's composition and end-use properties should differ from immediately adjacent layers.  (<u>See</u> '055 Patent col. 2, ll.44-54, ECF No. 1-4 at PageID 14.)

The '055 Patent teaches, and the prosecution history supports, that resins are chosen prior to processing for their "specific film end-use properties." When the patentee amended its claims to include the disputed terms, it specifically cited support for its amendment in the specification. The patentee relied on the Detailed Description of the Invention, which provides that the individual layers or "combinations of said layers may be the same or different polymer resins selected for specific end-use properties." ('055 Patent col. 2, ll.42-44, 47-49, 52-54, ECF No. 1-4 at PageID 14.) This description does not indicate that resins are processed and thereafter exhibit the end-use properties for which they were selected; rather, this indicates the resins were selected before processing for their end-use properties. Additionally, the '055 Patent does not indicate that processing conditions create the compositional properties expressed in dependent Claims 29-35, e.g., "tensile strength," "melt index," "density," and "resin additive." (See '055 Patent, Claims 29-35, ECF No. 1-4 at PageID 26.) The '055 Patent instead indicates that the specific resins chosen dictate the finished layer's end-use properties. For example, the '055 Patent explains that specific resins are preferable based on their melt indexes and densities. (See, e.g., '055 Patent, col. 6, ll. 5-25, ECF No. 1-4 at PageID 16.) The '055 Patent further states that "[i]t

17

is understood by those skilled in the art that the lower the melt index or flow index, the higher the molecular weight" ('055 Patent, col. 5, ll. 50-52, ECF No. 1-4 at PageID 16), a measurement independent of processing.  The patent thus concedes that those skilled in the art understand that the melt index of each layer is changed by manipulating the resin(s) and/or resin(s) and resin additive(s) to alter the molecular weight of the layer before processing.  Additionally, because the presence of a resin additive constitutes a "compositional property" (Claim 32, '055 Patent, ECF No. 1-4 at PageID 26) the patent conveys that the finished product layers are distinguished by resin(s) and/or resin(s) and resin additive(s) used, irrespective of process.  In short, the patent specification and patent prosecution teach that the differing end-use properties among the layers hinge on the resin(s) and/or resin(s) and resin additive(s) chosen prior to processing.

The '055 Patent specification and prosecution history also teach that each layer differs in its makeup from each immediately adjacent layer.  For example, the patentee specifically found support for its amendment to include the disputed terms in the specification where it states, "[i]t is preferred that the inner five layers are different one to the

other in that at least two different polymer resins are used in any combination to make up the five layers." ('055 Patent, col. 4, ll. 29-32, ECF No. 1-4 at PageID 15.)  This language indicates that it is not simply the end-use properties that ought to differ between layers, but also the composition, i.e., the resin(s) and/or resin(s) and resin additive(s) and the amount of such ingredients.  Further, before amending the patent to include the disputed terms, the patentee sought to differentiate its patent from the Miro Patent, and in doing so explained compositionally and structurally different layers: [4]

> To better understand the argument against the anticipation rejection, the Patentees believe it to be beneficial to specifically point out the distinction between "structural" and "compositional" layers.  The stretch wrap film claimed by the Patentees has seven <u>structurally</u> identifiable layers, but it is <u>not</u> important whether it has seven <u>compositionally</u> different layers.  In other words, the claimed stretch wrap film may be represented by both of the following:  (1) A/A/A/A/A/A/A, a film having seven structurally identifiable layers which are not compositionally different (i.e., it may be described as having seven structural layers, but only one compositional layer); and (2) A/B/C/D/E/F/G, a film having seven structurally distinct layers which are also compositionally different (i.e., it may be described as having seven structural layers and seven compositional layers).

---

[4] The Court reiterates that it does not find that the patentee made an "unambiguous" disavowal of claim scope during prosecution, but finds that the prosecution history indicates a significant back-and-forth between the patentee and the Examiner's Office focusing on the way layers were to be distinguished in the seven-layer stretch-film wrap.  For this reason, the Court references the prosecution history as support for the scope of the specification and claims. (<u>See</u> ECF No. 95 at PageID 3383-84.)

(ECF No. 55-7 at PageID 1172.)  The Examiner rejected the
'055 Patent over the Miro Patent, which disclosed an
A/C/B/B/B/C/A film, having "seven structurally
identifiable layers," because the '055 Patent did not
require adjacent layers to have different compositions.
(ECF No. 55-11 at PageID 1554.)  To overcome this
rejection, the patentee amended the '055 Patent to include
the disputed terms.  The patentee's explanation regarding
structurally and compositionally different layers in
conjunction with the amended language included to overcome
the Miro Patent, indicates that the claimed seven-layer
film requires that each layer differ in its makeup from
each immediately adjacent layer.  The Court also finds
that this definition comports with extrinsic evidence.
The Eastern District of Tennessee, in construing the same
terms, determined that "different compositional
properties" required "different compositions on a
molecular level, and that composition would then yield a
desire effect."  (See ECF No. 59-3 at PageID 2756
(attaching Claim Construction Order (Aug. 6, 2010), ECF
No. 282, Quintec Films Corp v. Pinnacle Films, Inc., No.
4:06-cv-00078 (E.D. Tenn. 2010) as Exhibit 12.)

Finally, the '055 Patent specification and
prosecution history teach that each layer's end-use

properties differs from each immediately adjacent layer. The patent specification emphasizes the use of particular resin(s) and/or resin(s) and resin additive(s) to create various end-use properties among layers.  For example, the patent specification disclosed that the claimed seven-layer film, having differing end-use properties between adjacent layers, is preferable over prior art.  ('055 Patent, Figs. 1-2, ECF 1-4 at PageID 13.)  Dependent Claims 29-35 also explicitly teach that "compositional properties" include end-use properties.  ('055 Patent, Claims 29-35, ECF No. 1-4 at PageID 26.)  The parties agree that the end-use properties between immediately adjacent layers differs.  (See No. 12-2108, ECF Nos. 181-82.)  Thus, the '055 Patent specification and prosecution history teach that each layer's end-use properties differs from each immediately adjacent layer.

Multilayer attempts to argue for a construction that would cover a compositionally indistinguishable seven-layer film (e.g., A-A-A-A-A-A-A) whose end-use properties differ among each immediately adjacent layer (e.g., $A^{density}$-$A^{flexibility}$-$A^{thickness}$-$A^{elongation}$-$A^{density}$-$A^{thickness}$-$A^{flexibility}$). (No. 12-2108, ECF No. 182 at PageID 4179.)  This result would require processing each immediately adjacent layer

21

differently.  The patentee explained during prosecution

that unprocessed

> B/B/B [layers would] 'bond[] to create a single
> layer' for many reasons, including the fact that the
> B/B/B material is all the identically same material,
> processed through the same extruder under one set of
> processing conditions, and all experiencing the same
> processing post extruder until they are separated in
> the feedblock. Furthermore, during the period of
> separation in the feedblock . . . each polymer stream
> experiences similar shear stresses and process
> temperatures.

(No. 21-2112, ECF No. 53-10 at PageID 531.)

If these unprocessed layers bond together after

processing, patentee argued, they become a single layer.

(ECF No. 55-7 at PageID 1174.)  The Patent Trial and

Appeal Board agreed.  (See ECF No. 53-8 at PageID 503.)

To remain separate layers, the processing of immediately

adjacent, identical layers must differ.

For the '055 Patent to cover a compositionally

indistinguishable seven-layer film whose end-use

properties differ among each immediately adjacent layer,

the patent would need to teach how "compositionally and

physically identical [unprocessed layers], freshly

extruded and still hot, do not fuze [sic] to become a

single layer when they come into contact with one another"

after processing.  (Id.)  But the '055 Patent does not

teach processing immediately adjacent, identical layers

differently.  At most, the '055 Patent describes the use
of extruders with differing barrel diameters among layers
(see, e.g., '055 Patent, col. 9 ll. 1-2, ECF No. 1-4); but
the use of multiple extruders alone, patentee argued, does
not prevent identical, adjacent layers from bonding.  (ECF
No. 55-7 at PageID 1178 ("[I]t is not necessarily uncommon
to have seven extruders feeding a five-layer feedblock.")
One skilled in the art would then understand the '055
Patent as only covering a processed, seven-layer film
whose immediately adjacent layers differ both in
composition and end-use properties (e.g., $A^{density}$-$B^{flexibility}$-
$C^{elongation}$-$D^{thickness}$-$E^{elongation}$-$F^{density}$-$G^{flexibility}$).

Because the patent specification and prosecution history
teach that the resin(s) and/or resin(s) and resin additive(s)
of each layer are chosen for their "specific film end-use
properties" prior to processing, and that each layer's
composition and end-use properties should differ from
immediately adjacent layers, the Court construes "wherein each
of said two outer layers and each of said five inner layers
have different compositional properties when compared to a
neighboring layer" as "wherein each of said two outer layers
and each of said five inner layers has a different composition
and end-use properties than each immediately adjacent layer."

23

The Court further construes "compositional properties" to
mean "an end-use property after processing the combined
resin(s) and/or resin(s) and resin additive(s)."  As stated
above, the Court concludes that the '055 Patent does not teach
that the extrusion process imparts different compositional
properties to a polymeric layer within the polymeric structure.
Nevertheless, the Court acknowledges the patentee's prosecution
argument that differing processing between layers can convey
different end-use properties, even on layers of the same
composition. (ECF No. 55-12 at PageID 1659.)  The Court also
acknowledges that courts "must generally take care to avoid
reading [method] limitations into [product] claims . . .
because the process by which a product is made is irrelevant to
the question of whether that product infringes a pure [product]
claim."  Baldwin Graphic Sys., Inc. v. Siebert, Inc., 512 F.3d
1338, 1344 (Fed. Cir. 2008).  The Court thus concludes that an
end-use property is the result after processing the combined
resin(s) and/or resin(s) and resin additive(s).

**2. The Parties' Constructions**

The Court rejects Multilayer's proposed construction as an
improper attempt to capture uncovered technology.  Under
Multilayer's construction, the '055 Patent may cover a seven-
layer film, wherein each layer is of the exact same composition

but has undergone a process different than the immediately adjacent layer. The Court finds that the patent specification fails to describe such a technology.

"The claims are directed to the invention that is described in the specification; they do not have meaning removed from the context from which they arose." <u>Netword, LLC v. Centraal Corp.</u>, 242 F.3d 1347, 1352 (Fed. Cir. 2001). "'Claim construction' is the judicial statement of what is and is not covered by the technical terms and other words of the claims." <u>Id.</u>

For the reasons stated above, neither the patent specification nor prosecution history indicates that the seven-layer film claimed in the '055 Patent contemplates a film wherein each layer is of the exact same composition but has undergone a process different than the immediately adjacent layer. Rather, the intrinsic evidence supports a seven-layer film wherein each layer has a different composition and end-use properties than the immediately adjacent layer, irrespective of the processing history.

The Court also rejects Berry's construction. Berry seeks to add "desired, physically distinguishable and material effect" into the Court's previously proposed construction. (No. 12-2108, ECF No. 181.) First, Berry improperly seeks to

read "intent" into the claim by including the term "desired."

Second, the Court finds that the term "material effect" is not found in the patent's specification, nor is this term used in the claims. Without intrinsic evidence to define this term, it is vague and potentially unhelpful to a jury. See Funai Elec. Co., Ltd. v. Daewoo Elecs. Corp., 616 F.3d 1357, 1366 (Fed. Cir. 2010) ("The criterion is whether the explanation aids the court and the jury in understanding the term as it is used in the claimed invention."). Third, the Court rejects Berry's inclusion of "physically distinguishable" as redundant. The intrinsic evidence and claims make clear that immediate adjacent layers must be physically distinguishable, i.e., identifiable, from one another. These distinctions, the Court has concluded, are the composition as well as the end-use properties of each layer. The Court, therefore, finds the addition of "physically distinguishable" to the construction unnecessary.

## IV. CONCLUSION

For the reasons stated above, the Court construes "wherein each of said two outer layers and each of said five inner layers have different compositional properties when compared to a neighboring layer" as "wherein each of said two outer layers and each of said five inner layers has a different composition

and end-use properties than each immediately adjacent layer";
and construes "compositional properties" as "an end-use
property after processing the combined resin(s) and/or resin(s)
and resin additive(s)."

**IT IS SO ORDERED**, this 9th day of February, 2017.

 /s/ Jon P. McCalla
JON P. McCALLA
UNITED STATES DISTRICT COURT JUDGE

| CLAIM TERM | MULTILAYER'S PROPOSED CONSTRUCTION | BERRY'S PROPOSED CONSTRUCTION | COURT'S CONSTRUCTION |
|---|---|---|---|
| Wherein each of said two outer layers and each of said five inner layers have different compositional properties when compared to a neighboring layer | "wherein each of said two outer layers and each of said five inner layers has different end-use properties than each immediately adjacent layer" | "wherein each of said two outer layers and each of said five inner layers is a different composition than each immediately adjacent layer, which, in turn, yields a different end-use property" | "wherein each of said two outer layers and each of said five inner layers has a different composition and end-use properties than each immediately adjacent layer" |
| Compositional properties | "an end-use property" | "an end-use property which yields a desired, physically distinguishable and material effect as a result of the combined ingredients" | "an end-use property after processing the combined resin(s) and/or resin(s) and resin additive(s)" |